**DAVID J. HOLDSWORTH (4052)**

Attorney for Plaintiff

9125 South Monroe Plaza Way, Suite C

Sandy, UT  84070

Telephone (801) 352-7701

Facsimile (801) 567-9960

david_holdsworth@hotmail.com

---

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | | |
|---|---|---|
| HOWARD O. FORD, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MEGAN BRENNAN, POSTMASTER | : | |
| GENERAL, UNITED STATES | : | |
| POSTAL SERVICE, | : Case No. | |
| | : | |
| Defendant. | : Hon. | |

COMES NOW the Plaintiff, Howard O. Ford, complains of Defendant

Megan Brennan, Postmaster General, U.S. Postal Service, demands trial by jury and as

and for causes of action alleges as follows:

### JURISDICTION

1.      This action is brought pursuant to Title VII of the Civil Rights Act

of 1964, as amended, the Age Discrimination in Employment Act of 1967, as

amended, and the Vocational Rehabilitation Act of 1973, as amended, for

discrimination in employment and for retaliation. Jurisdiction is specifically conferred

on this Court by 42 U.S.C. § 2000 e (5). Equitable and other relief are also sought

under 42 U.S.C. § 2000 e (5) (g). Jurisdiction is also based on 28 U.S.C. §§ 1331,

1332 and 42 U.S.C. § 1981, et. seq. Where employment discrimination based upon

age is alleged, jurisdiction is conferred by the Age Discrimination in Employment Act

("ADEA"). Where employment discrimination based upon disability is alleged,

jurisdiction is conferred by the Vocational Rehabilitation Act of 1973, as amended.

## PARTIES

2.    Howard O. Ford is a citizen of the United States and a resident of

the State of Utah.

3.    The USPS is a quasi independent agency of the federal

government which conducts operations in the State of Utah and which is an

"employer" with the meaning of Title VII, the Age Discrimination in Employment Act,

and the Vocational Rehabilitation Act and which was Mr. Ford's employer during the

periods of time relevant to this action.

4.    At all times relevant to this action, the individual(s) whose actions

are complained of herein are and/or were employees or agents of the USPS, and for all

purposes herein, acted within the course and scope of their employment with and for

the USPS such that their actions and inactions are attributable to the USPS.

**VENUE**

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that the claims arose in Salt Lake County, State of Utah, the USPS employed Mr. Ford in the State of Utah; all of the employment practices alleged herein were committed within the State of Utah; and the relevant employment records are believed to be maintained in the State of Utah.

**STATEMENT OF FACTS**

6.      Mr. Ford is a long-term employee with the USPS.  He was a "letter carrier".  He worked out of the Cottonwood/Cottonwood Heights station. Unfortunately, during his long tenure with the USPS, he sustained several on-the-job physical and mental injuries.  Those injuries substantially limited one or more of his major life activities, such as lifting, carrying, pushing, pulling, reaching, twisting and bending and dealing with stress and conflict.

7.      On May 17, 2007, Mr. Ford suffered an on-the-job injury to his neck.  The relevant diagnosis was "aggravation of cervical disc disease".  Thereafter, he duly and timely filed a claim for benefits under the Federal Employees Compensation Act ("FECA") with the U.S. Department of Labor's Office of Workers' Compensation Programs ("OWCP").  OWCP assigned this case Claim No. 122044768.

8.      Due to this 2007 injury, Mr. Ford was unable to work for about a month.

9.      He returned to work in approximately mid-June 2007.

10.     OWCP eventually accepted Mr. Ford's claim for the condition of aggravation of cervical disc disease. *See* the Decision of Hearing Representative Mary Ann Meier dated October 1, 2007.

11.     On information and belief, Mr. Ford alleges OWCP notified the USPS of this claim and the acceptance for the condition of aggravation of cervical disc disease set forth above.

12.     On January 8, 2011, Mr. Ford suffered another on-the-job injury to his neck. The relevant diagnosis was "sprain of neck, cervicalgia and aggravation of degenerative disc disease". Thereafter, Mr. Ford duly and timely filed a claim for benefits under FECA. OWCP assigned this case Claim No. 122068841.

13.     Due to this 2011 injury, Mr. Ford was off work for about 11 weeks. He tried to return to work in early March 2011. *See* letter of March 3, 2011. That return to work effort was unsuccessful and he was off for several more weeks until April 28, 2011. *See* University of Utah Occupational Medicine Clinic Note dated April 28, 2011.

4

14.    Thereafter, Mr. Ford underwent a course of physical therapy.  *See* letter dated June 20, 2011.  Eventually, Mr. Ford was able to return to work.  *See also* letter from Dr. Eric Wood dated December 8, 2011 discussing Mr. Ford's cervicalgia.

15.    Mr. Ford sent such letters and notes from his medical providers to the USPS Injury Compensation Office in Salt Lake City.

16.    Eventually, OWCP sent Mr. Ford to Dr. Michael Callahan for a second opinion examination.  Based on Dr. Callahan's report, OWCP accepted the claim for the conditions of sprain of neck, degeneration of cervical intervertebral disc, spinal stenosis in cervical region and brachial neuritis or radiculitis NOS.  *See* Dr. Callahan report.  *See* letter from OWCP dated February 16, 2012.

17.    On information and belief, Mr. Ford alleges OWCP notified the USPS of this claim and the acceptance for the conditions set forth above.

18.    Mr. Ford's physician released Mr. Ford to return to work with certain restrictions.  (Dr. Callahan had also recommended limiting his work to an eight-hour shift, and not requiring him to perform overtime work activities.)  *See also* medical notes from University of Utah Health Care Occupational Medicine Clinics dated May 31, 2012 and February 14, 2013.

19.     In approximately April 2013, Andrea Gunnarson started at the Cottonwood Station as the manager of the station and Heidi Clark started at the Cottonwood Station as the acting supervisor over the carriers in the station.

20.     On April 15, 2013, Mr. Ford was involved in an confrontation with Heidi Clark involving, among other things, Mr. Ford's having approved FMLA requests for three serious health conditions.  *See* Mr. Ford's narrative.

21.     As a result of such confrontation and related situations, Mr. Ford started developing the psychological conditions of anxiety, depression and PTSD.

22.     As a result of such psychological conditions, Mr. Ford was off work from April 15, 2013 to May 1, 2013.  In addition to continuing to treat with Dr. Eric Wood, Mr. Ford also began treating with Dr. Marc Morse.  He also began utilizing the EAP Services which the USPS provided.

23.     The critical time frame at issue in the instant Complaint is just prior to the July 16, 2013 incident and just after the July 16, 2013 incident.

24.     Mr. Ford has a long term/probably permanent neck impairment. Mr. Ford's neck impairment is substantially limiting to several major life activities and constitutes a disability.

25.     As of July 16, 2013, Mr. Ford had filed (and OWCP had accepted) two workers' compensation claims for neck injuries and had recently been off work for about two weeks due to psychological conditions.

26.     Mr. Ford alleges that the USPS was aware that Mr. Ford has two prior accepted workers' compensation claims for neck injuries.  Mr. Ford alleges that knowledge that an employee has one or more accepted workers' compensation claims is sufficient to put the USPS on notice that the employee's accepted conditions may constitute a disability.

27.     After his 2007 neck injury and after his 2011 neck injury, Mr. Ford had applied for FMLA leave and been approved for FMLA leave.  The USPS was aware that Mr. Ford had applied for and had been approved for FMLA leave.

28.     Mr. Ford alleges that the knowledge that an employee has a serious health condition for which he has applied for and been approved for FMLA protection is sufficient to put the USPS on notice that the employee's serious health conditions may constitute a disability.

29.     Mr. Ford alleges that knowledge that an employee has accepted OWCP claims for neck injuries and approved FMLA leave requests for neck conditions is sufficient to constitute a request for a reasonable accommodation to avoid placing the employee in situations which might re-injure his neck and/or aggravate his

serious health condition or to put the USPS on notice of the want or need by the employee of a need for a reasonable accommodation.

30.    Mr. Ford alleges that, beginning on May 1, 2013, when Mr. Ford returned to work and continuing thereafter on a frequent basis, management harassed him about his need for reasonable accommodation for his neck impairment and, specifically, about the amount of time he was taking in the office before "going out on the street" to deliver his mail.

31.    On May 11, 2013, Mr. Ford had a discussion with his supervisor, Heidi Clark, regarding his neck impairment and how it affected his ability to lift packages and otherwise put strain on his neck.  *See* Mr. Ford's narrative entitled "5/11-5/18/2013 Statement, Week of Postal Service Food Drive".

32.    Mr. Ford alleges that, virtually every Tuesday from mid-May 2013 to July 16, 2013, he discussed his neck impairment with Ms. Clark.  Mr. Ford alleges that, on virtually every Tuesday between May 23, 2013 and July 16, 2013, Mr. Ford would have discussions with Ms. Clark about "Advos" and "Red Plums" and the way he would load his mail.  Mr. Ford explained to Ms. Clark that he couldn't bend over and lift heavy tubs of mail so he put his "letters" (*i.e.,* envelopes) and "flats" (*i.e.,* magazines) on top of the parcels he would place in the gurneys.  Ms. Clark told him that she didn't want him to tray up "Advos" in the office, that he should do it on the

8

street, and that she wanted him to make only one trip to the dock (using one gurney, not making two trips with using two gurneys).

33.     Mr. Ford alleges that he explained to Ms. Clark that loading all of his mail (parcels, letters and flats) into one gurney so as to make only one trip wasn't a good idea because it would overload the gurney and would involve exposing him to hazards in bending, lifting, loading, reaching, pushing and pulling and unloading the gurney.  Mr. Ford explained to Ms. Clark that, in doing his job his way, he was following his doctor's restrictions.  Ms. Clark ordered and continued to order Mr. Ford to lift weights in excess of his restrictions and to load all of his mail into one gurney, not two.  *See* Mr. Ford's narrative regarding events of May 23, 2013 (Ms. Clark wanting Mr. Ford to make only one trip with one gurney to the dock).  *See* Mr. Ford's narrative statement regarding event on June 4, 2013, June 5, 2013, June 6, 2013, June 8, 2013.  And *see* Mr. Ford's narrative entitled "6/20-6/24/2013 Statements".  *See also* Mr. Ford's narrative, "Events of 6/25/13".

34.     During this May to June 2013 time frame, Mr. Ford had told Ms. Clark that he had already experienced on-the-job neck injuries and that he was concerned that overloading one gurney would be an unsafe method of moving the mail from the workroom floor to his Postal Service vehicle.  Mr. Ford had previously provided doctor's restrictions and had requested a reasonable accommodation in the

form of loading the mail consistent with his doctor's restrictions, so that when Heidi Clark ordered him to load the mail as she wanted him to load it, she knew that such would be at variance with his request for accommodation and potentially hazardous.

35.    Thus, by July 16, 2013, Mr. Ford had made Ms. Clark well aware of Mr. Ford's neck impairment/disability and Mr. Ford's interest in assembling his mail in the office and transporting it to his USPS vehicle in a way that would not cause further injury to his neck.

36.    Nevertheless, on July 16, 2013, Heidi Clark gave Mr. Ford a direct order to load his mail into one and only one hard plastic parcel gurney (the "orange gurney") and push it to his USPS vehicle.

37.    Mr. Ford followed Ms. Clark's direct order and loaded an orange gurney, as directed, and began pushing the same from the office to his USPS vehicle. As he was pushing his fully loaded and overloaded gurney, he suffered an on-the-job injury.  *See* Mr. Ford's statement entitled "Events from July 16, 2013", five pages. *See also* explanation contained in the two 1767s that Mr. Ford filed on July 16, 2013. *See* Grievance No. 13465 Mr. Ford filed on July 29, 2013.

38.    Thus, Mr. Ford is alleging that, on July 16, 2013, local management harassed him on the basis of his disability and failed to accommodate his disability regarding:

      a.     the amount of time Mr. Ford had requested to perform his job duties;

      b.     the method Mr. Ford has requested to perform his job duties which Mr. Ford had historically utilized, in that his supervisor ordered Mr. Ford to load <u>all</u> of his mail into one orange gurney and make only one trip to his vehicle, even though Mr. Ford had informed his supervisor that doing so—loading all of his mail into one gurney and having to push it—would likely hurt his neck;

      c.     after Mr. Ford expressed such a concern, which was essentially a request for a reasonable accommodation—local management failed to reasonably accommodate his disability and accused Mr. Ford of arguing with his supervisor;

      d.     only after Mr. Ford had injured himself and informed his supervisor that he needed to go home, local management instructing him to see a doctor;

      e.     local management advising Mr. Ford he would be on the clock for the visit to his doctor, yet not paying Mr. Ford continuation of pay ("COP") or any pay for his time on that day (July 16, 2013).

39.    Subsequently, Mr. Ford filed a claim for his work-related injury. On July 17, 2013, Mr. Ford filed a CA-1 claim for a traumatic injury.  OWCP assigned the case Claim No. 125060548.  The USPS was fully aware of this injury and claim because it tried to controvert it.  *See* USPS letters dated July 22, 2013.

40.    On August 9, 2013, OWCP sent Mr. Ford a "development" letter.

41.    On September 4, 2013, Mr. Ford responded to OWCP's development letter.

42.    On September 12, 2013, OWCP issued a Notice of Decision, denying the claim on the ground that Mr. Ford had not established a "fact of injury".

43.    Mr. Ford disagreed and filed a request for an oral hearing.

44.    On January 29, 2014, Mr. Ford (via his attorney's office) sent a letter and medical evidence relating to the fact of injury, in preparation for the hearing.

45.    As a result of Mr. Ford's attorney's January 27, 2014 submission, OWCP decided Claim No. 125060548 was not in a posture for a hearing and remanded the case for a second opinion orthopedic examination.

46.    OWCP then scheduled a second opinion examination for July 2, 2014.  Mr. Ford attended such second opinion examination.  By letter dated August 6, 2014, OWCP conveyed the second opinion report to Mr. Ford.

47.     By letter dated October 22, 2014, OWCP accepted the claim as to the July 16, 2013 injury for the conditions of "temporary aggravation, multilevel degenerative disc disease/degenerative joint disease", 722.4.

48.     On July 22, 2013, Mr. Ford's physician, Dr. Eric Wood, wrote a note that, due to the failure of station management to accommodate Mr. Ford's work restrictions, Mr. Ford was unable to work from July 15, 2013 to July 22, 2013.

49.     On July 22, 2013, Mr. Ford's physician, Dr. Eric Wood, filled out an OWCP form in which he stated that Mr. Ford's pushing a heavy cart at work had aggravated Mr. Ford's chronic cervicalgia.  Dr. Wood imposed the following restrictions:

- •   no professional driving

- •   no lifting above shoulder on the right

- •   limited lifting with right arm to 15 lbs.

- •   limited body rotation

- •   use more ergonomically suitable equipment at work

*See* Dr. Wood note dated July 22, 2013.

50.     Such note constitutes <u>another</u> request by Mr. Ford for a reasonable accommodation.

51.     On July 24, 2014, Mr. Ford went back to work.  Mr. Ford worked July 24, 25, and 26, 2014.  After Mr. Ford's return, the USPS continued to harass Mr. Ford on the basis of his disability and continued to fail to accommodate Mr. Ford's disability.  Such harassment and failure to accommodate aggravated both Mr. Ford's physical and mental disabilities to such a degree that he became unable to function and to work for a period of time.

52.     Mr. Ford has several health impairments which constitute disabilities.  At issue in the instant case are his disabilities of cervical spine degeneration (chronic neck pain) and, also, his psychological conditions of anxiety, depression and post-traumatic stress disorder ("PTSD").

53.     Mr. Ford made the USPS aware of his disabilities.

54.     Mr. Ford made requests for a reasonable accommodations.

55.     Mr. Ford alleges that all of the above put the USPS on notice that Mr. Ford had disabilities, and put the USPS on notice of his need for accommodations for such disabilities.

56.     Mr. Ford also alleges that events subsequent to July 16, 2013 put the USPS on notice of his desire for and need for reasonable accommodations.

57.     Mr. Ford alleges that, beginning on July 16, 2013 and thereafter, local management harassed him on the basis of his disabilities and failed to accommodate his disabilities in that:

a.     when Mr. Ford requested copies of his PS Form 3917s, his supervisor initially did not provide the forms for the events of July 16, 2013 or July 29, 2013;

b.     When, on various occasions from July 16, 2013 to July 29, 2013, Mr. Ford made various requests for forms, such as Form CA-1, Form CA-16, Form CA-17, and PS Form 3971, local management denied him such forms;

c.     Mr. Ford's supervisor telling Mr. Ford that he was cleared of his accountables when he was not;

d.     Mr. Ford's supervisor speaking to him in an angry tone and asking him if he was so stressed out, why didn't he just leave instead of walking around making sure he had everything gathered up.

58.     Mr. Ford alleges that, on July 29, 2013, the USPS again failed to accommodate his disabilities, which caused his physical and mental disabilities to get worse and more disabling.  *See* Mr. Ford's narrative entitled "Events of 7-29-2013".

59.     On July 29, 2013, Mr. Ford went to Dr. Morse (for treatment of anxiety).  Dr. Morse took him off work.  Mr. Ford has been off work ever since due to the aggravation of his physical and mental disabilities.

60.     On August 15, 2013, union steward Jennifer Ogden had a conversation with station manager Andrea Gunnarson.  During said conversation, Ms. Gunnarson indicated she was aware of Mr. Ford's three FMLA cases and stated, "Howard Ford is not getting away with his crap on my watch."  *See* statement of Jennifer Ogden (Formal A Steward).

61.     On September 4, 2013, Heidi Clark issued Mr. Ford a letter of warning.  Mr. Ford filed a grievance regarding such letter of warning and it was rescinded.

62.     Eventually, the USPS issued Mr. Ford an offer of limited duty. By fax dated November 21, 2014, Mr. Ford responded to the offer of limited duty, explaining that the offer of limited duty needed to address his physical and mental disabilities and needed to be approved by his treating physicians.

63.     By letter dated January 21, 2015, the USPS issued Mr. Ford another offer of modified duty.  By letter dated February 13, 2015, Mr. Ford duly responded to such offer of limited duty.

64.     The suitability of such offer is still pending a decision by OWCP.
*See* OWCP (Eric Newton) letter dated March 12, 2015.

65.     After July 29, 2013, the USPS continued to fail to accommodate
Mr. Ford's physical and mental disabilities.  This failure continued until the USPS
terminated Mr. Ford's employment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF GENDER

66.     Plaintiff incorporates by this reference all allegations listed in
paragraphs 1 through 65 above as if alleged in full herein.

67.     Mr. Ford alleges that local management has not treated similarly
situated female employees in as harsh and adverse a manner as it treated Mr. Ford.
Thus, Mr. Ford alleges that the circumstances described above constitute violations of
Title VII of the Civil Rights Act.

### SECOND CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF AGE

68.     Plaintiff incorporates by this reference all allegations listed in
paragraphs 1 through 67 above as if alleged in full herein.

69.     Mr. Ford alleges that local management has not treated similarly
situated younger employees in as harsh and adverse a manner as it treated Mr. Ford.

Thus, Mr. Ford alleges that the above circumstances described above constitute violations of the ADEA.

## THIRD CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF DISABILITY

70.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 69 above as if alleged in full herein.

71.    Mr. Ford alleges that local management has not treated similarly situated non-disabled employees in as harsh and adverse a manner as it treated Mr. Ford.  Thus, Mr. Ford alleges that the circumstances described above constitute violations of the Vocational Rehabilitation Act.

72.    Mr. Ford alleges he has exhausted all administrative procedures and remedies as to such alleged violations of the EEO laws.

## PROCEDURAL HISTORY AS TO EEO COMPLAINT NO. 1

73.    On or about September 4, 2013, Mr. Ford contacted an EEO counselor and on September 11, 2013, Mr. Ford filed an informal complaint (P.S. Form 2564-A) requesting EEO counseling.  In his Complaint, he alleged that the USPS had discriminated against him on the basis of his gender, age and disability in that it had exhibited a flagrant disregard for his prior injuries and safe practices, manifested continued hostility towards him and treated him differently than how it had treated other employees not in his protected classes.

18

74.     On or about October 8, 2013, Mr. Ford filed a Formal Complaint (P.S. Form 2565) asserting the same claims he had asserted in his informal complaint. Mr. Ford refers herein to this EEO Complaint as "EEO Complaint No. 1".

75.     By letter dated November 7, 2013, the USPS accepted the issues in the EEO Complaint No. 1.

"1.     Upon your return to work on May 1, 2013, you were harassed about your medical documentation and the amount of time you taking in the office;

2.     On July 16, 2013, you were subjected to harassment, including:

(a)     Your supervisor argued with you about the amount of time you requested to perform your duties;

(b)     Your supervisor instructed you to load all of your mail into an orange gurney and make one trip to your vehicle, even though you informed her that doing so hurts your neck;

(c)     You were accused of arguing with your supervisor and taken into the office for a discussion;

(d)     After you informed your supervisor that you were going home, you were instructed to go see a doctor; and

19

(e)    Although you were advised that you would be on the clock for the doctor's visit, you later became aware that you were not paid Continuation of Pay ("COP") for this time;

3.    On various occasions, from on or about July 16, 2013 through July 29, 2013, Management denied your requests for forms, including Form CA-1, Form CA-16 and P.S. Form 3971;

4.    On July 29, 2013, you were subjected to harassment, including:

(a)    When you informed management that you were leaving, you were instructed to go see a doctor;

(b)    When you requested copies of all of your P.S. Form 3971s, your supervisor initially did not provide the forms for July 16, 2013 or July 29, 2013;

(c)    You supervisor told you that you were cleared on your accountable[s] when you were not; and

(d)    Your supervisor spoke to you in an angry tone and asked if you were so stressed out, why you didn't "just leave instead of walking around making sure you have everything gathered up?"

76.    On March 31, 2014, Mr. Ford requested a hearing with the EEOC

laint No. 1.

77.    Eventually, by a Case Management Order, the EEOC assigned the

case to Administrative Law Judge Marianna Warmee.

78.    On April 30, 2015, Mr. Ford filed a Motion to Clarify the Nature

and Scope of His Claim of Discrimination on the Basis of Disability, by asserting:

> When Mr. Ford filed the instant EEO Complaint, he
> identified that he was claiming discrimination on the basis
> of disability (among other bases) with respect to certain
> actions, decisions and events which occurred in the May to
> July 2013 time frame.

> Just as with discrimination on the bases of gender
> and age, or any other protected characteristic,
> discrimination on the basis of disability may take several
> forms: harassment, hostile work environment, disparate
> treatment, taking adverse action because of a disability, etc.
> However, unlike claims of discrimination on the bases of
> gender, age, etc., discrimination on the basis of disability
> can also take the form of failure to make accommodations
> to a known disability of a qualified individual with a
> disability. *See, generally, Vande Zande v. Wisconsin Dept.
> Of Administration,* 44 F.3d 538 (7th Cir. 1995).

> In terms of the nature and scope of the claim for
> disability discrimination in the instant case, the question the
> instant EEO complaint and the Investigative File presents is
> this: if a Complainant alleges the purview of disability,
> does that necessarily or automatically cover or encompass
> or include or comprehend the concept of failure to
> accommodate a disability?

Mr. Ford's position is that it does. *See Riel v. EDS Corporation,* 99 F.3d 678 (5th Cir. 1996). The Agency's position may be that it doesn't. Fortunately, we don't need to answer that question in the abstract because the parties are early enough in the EEOC hearing process that Mr. Ford can make it explicit, without causing any prejudice to the Agency, that under the general purview of discrimination on the basis of disability, he is intending to assert not only the sub-claims of harassment, hostile work environment and disparate and adverse treatment, but also the sub-claim of failure to accommodate—that the Agency knew about his disability and knew about his requests for accommodations, yet failed to afford him reasonable accommodations for his disability.

Mr. Ford's sub-claim of discrimination on the basis of disability in the form of failure to accommodate tracks the allegations already made and the elements of the prima facie case of failure to accommodate. Thus, he alleges:

(1)     Mr. Ford is a person with a disability.
(2)     Mr. Ford is a qualified individual with a disability.
(3)     Mr. Ford made his disability known to his Employing Agency or the Agency was otherwise aware of his disability.
(4)     Mr. Ford requested reasonable accommodations.
(5)     The Agency refused or failed to afford Mr. Ford the accommodations he requested or provide reasonably equivalent alternative accommodations.
(6)     Such failures caused Mr. Ford damages of various kinds.

Clarifying the nature of Mr. Ford's claim of discrimination on the basis of disability by recognizing that his umbrella claim of disability discrimination includes a sub-claim of failure to accommodate will not prejudice the Agency. Here's why:

(1)     Mr. Ford's claim of discrimination on the basis of disability implicitly included the concept of failure to accommodate. In

22

other words, Mr. Ford is not telling the Agency anything it doesn't already know (or should know).

(2)      Mr. Ford is clarifying the nature and scope of his disability discrimination claim at the beginning of the EEOC adjudication process.  The Agency can engage in whatever discovery it wishes to engage in to "flesh out" the contours of the sub-claim of failure to accommodate.

Decision makers should decide cases on the merits. Parties may lose the right to have a case decided on the merits, of course, by missing deadlines or otherwise.  But we have advanced far beyond the traps of code pleading where some failure to allege a specific sub-claim in some code pleading way jeopardizes the viability of the real underlying claim.  Pleading is now governed by Federal Rules of Civil Procedure 8 (a), Rule 15 (a) and the relevant case law.

Applying the principles of Federal Rules of Civil Procedure 8 (a) and 15 (a) and treating the instant pleading as a motion for leave to file an amended pleading (and as the filing of such an amended pleading) and allowing Mr. Ford to make clear that Mr. Ford's claim of disability discrimination includes the sub-claim of failure to accommodate will enable the parties to address the full merits of Mr. Ford's claims, will give the Agency due notice as to the nature and scope of the disability discrimination claim Mr. Ford is asserting, will enable the parties to engage in whatever discovery they deem necessary on that sub-claim, and enable the EEOC to do substantial justice.

79.      By order dated June 5, 2015, Administrative Judge Warmee

denied Complainant's Motion to Clarify, but allowed Mr. Ford to file a Motion to

Amend the Complaint (EEO laint No. 1).

80.    On June 22, 2015, Mr. Ford then filed a motion to amend his EEO Complaint (Complaint No. 1) to assert claims for a continuing and ongoing failure to accommodate his disabilities.

81.    Subsequently, during the next 17 months, the EEOC did not act on Mr. Ford's motion to amend the EEO Complaint (EEO Complaint No. 1).

82.    Accordingly, on November 1, 2016, Mr. Ford filed a Request for Leave to Withdraw His Pending Request for Hearing and to Issue a Right to Sue Letter.  Said Request reads as follows:

> Howard Ford, by and through his counsel of record, David J. Holdsworth, requested the EEOC to (1) grant him leave to withdraw his pending Request for Hearing (said Request for Hearing has been pending since at least March 2, 2015 and, in particular, Mr. Ford's Motion for Leave to Amend Complaint has been pending since June 22, 2015); and (2) issue him a Notice of Right to Sue (a right to sue letter) so that he can file a lawsuit in an appropriate U.S. District Court.
>
> Mr. Ford requests the EEOC to take such steps for several reasons, including:
>
> (1)    Mr. Ford has filed several formal EEO Complaints, all of which are still active, but all of which are strung out in various stages of the administrative process and Mr. Ford desires to bring all of such cases together in one consolidated case.
> (2)    Mr. Ford believes such consolidation would be in the interest of economy for the parties and judicial efficiency.
> (3)    Mr. Ford's review of the hundreds of pages of documents produced during the course of discovery in the above-referenced case and in EEOC Case No. 540-2015-00154X persuades Mr.

24

Ford that he can satisfy his burden of proving that the USPS engaged in a deliberate campaign to not accommodate him, to foil his efforts to secure workers' compensation benefits for work-related injuries, to retaliate against him for filing EEO Complaints and claims for workers' compensation benefits due to having sustained injuries on-the-job injuries and to engineer the ending of his employment with the USPS. As a result, he desires to take all of his claims to a trial by a jury of his peers.

Mr. Ford does not take this step lightly. He does recognize that, in a sense, the USPS has forced the issue by filing a motion for a decision without a hearing in Case No. 540-2015-00154X. But, after engaging in discovery in the above-referenced case and in Case No. 540-2015-00154X and allowing the EEOC a decent interval of time to make rulings on issues of importance to the viability of his claims, and giving the matter due consideration, he believes taking the course of action described above is in his best interest.

Accordingly, he respectfully requests the EEOC to discontinue the administrative processing of his formal EEO Complaint and to issue him a Notice of Right to Sue.

83.    By letter dated December 20, 2016, the EEOC acted on such

withdrawal and granted the same.

84.    Thereafter, Mr. Ford requested the USPS to issue a Final Agency

Decision. The USPS has now issued a Final Agency Decision as to his EEO

Complaint No. 1.

**PROCEDURAL HISTORY AS TO EEO COMPLAINT NO. 2**

85.    Mr. Ford alleges that, after he filed his first EEO Complaint, the USPS continued to discriminate against him on the basis of gender, age and disability, and also began to retaliate against him, in that, among other adverse actions:

86.    In 2014, after OWCP accepted Mr. Ford's claim regarding the July 16, 2013 injury, management did not provide him with any job assignment or offer within his physical <u>and</u> mental restrictions.

87.    On October 7, 2014, the USPS terminated Mr. Ford's employment.  Such termination caused Mr. Ford to lose wages or the opportunity to earn wages and all the benefits that came with his USPS employment, including health insurance, life insurance, contributions to retirement, and other benefits.

88.    Mr. Ford, through his union, duly grieved the termination of employment.  On November 7, 2014, the USPS rescinded the Notice of Separation. However, the USPS did not restore Mr. Ford's health insurance in a timely manner or restore any other employment benefits.

89.    On or about October 24, 2014, Mr. Ford contacted an EEO counselor and made a request for pre-complaint EEO counseling.

90.    Subsequently, Mr. Ford filed an informal EEO Complaint.  The USPS acknowledged receipt of this Complaint via letter dated November 22, 2014.

91.     On or about December 9, 2014, Mr. Ford filed a Formal EEO Complaint, which was given Agency No. 4E-840-0003-15.  Mr. Ford refers herein to this EEO Complaint as "EEO Complaint No. 2".

92.     On or about April 17, 2015, Mr. Ford filed a Request for Hearing with the EEOC as to EEO Complaint No. 2.  Such case was given EEOC Case No. 540-2015-00154X.

93.     On November 1, 2016, Mr. Ford filed a Request for Leave to Withdraw His Pending Request for Hearing and for Issuance of a Notice of Right to Sue.

94.     On November 4, 2016, Administrative Judge Nancy Griffiths granted such Order.

95.     On December 21, 2016, the USPS issued a Final Agency Decision.

96.     Said Final Agency Decision gave Mr. Ford 90 days within which to file a civil action.

**THIRD CAUSE OF ACTION**
**RETALIATION**

97.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 96 above as if alleged in full herein.

27

98.    Mr. Ford alleges that, since Mr. Ford filed his first and second EEO Complaints, the USPS has continued to take adverse action against him because of his engaging in protected activity.

99.    In late 2014, the USPS canceled his health insurance.

100.    On June 22, 2015, the USPS reinstated Mr. Ford's health insurance, but the USPS didn't tell Mr. Ford about the cost to reinstate the health insurance (or anything else about who would be responsible for the cost or how the cost would be paid for).

101.    Mr. Ford is alleging this failure to inform with regards to his health insurance issues is another form of retaliation.

102.    On February 10, 2015, in settlement of a grievance, the USPS agreed to pay Mr. Ford COP for his lost wages since July 29, 2013, but has failed to do so. Mr. Ford is alleging this failure to pay COP with respect to an accepted OWCP claim is another form of retaliation.

103.    When the USPS agreed to pay COP (in February 2015) and then defaulted, that's when the adverse action occurred.

104.    Mr. Ford is alleging the failure to abide/perform the February 2015 settlement as another form of retaliation and a continuing violation.

105.    Beginning on or about March 30, 2015 and continuing thereafter on virtually a daily basis, Mr. Ford became aware (for the first time) of his supervisor mishandling and providing various types of false information with respect to his work-related (and later accepted) accident and injury of July 16, 2013.

106.    Mr. Ford is alleging that, from March 30, 2015 forward, he uncovered and discovered additional information showing the USPS has mishandled not only paperwork relating to his claims for workers' compensation benefits, but other aspects of his Postal Service employment.

107.    Mr. Ford is claiming the USPS' failure to handle information relating to his workers' compensation claims in a correct, timely or neutral manner is another form of retaliation, which is an ongoing and continuing violation.

**DAMAGES**

108.    The USPS' actions and omissions, as described above, have caused Mr. Ford losses, injuries and other damages.

109.    Such actions and omissions have caused Mr. Ford to experience the loss of wages and other benefits and privileges of his employment.

110.    Such violations have also caused Mr. Ford physical and psychological distress.

29

111.   Accordingly, Mr. Ford alleges the USPS is liable to Mr. Ford for all wages, wage increases and benefits, and other compensation, to which he would have been entitled but for the USPS's violation of Title VII, the Age Discrimination in Employment Act and the Vocational Rehabilitation Act, prejudgment interest on those losses, compensatory damages, and an additional amount as liquidated damages equal to the pecuniary damages (Mr. Ford alleging that such violations were wilful) plus prejudgment interest thereon, reasonable attorney's fees, reasonable expert witness fees and any other costs of this action, and for such other and further legal and equitable relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Howard O. Ford  hereby prays for the following relief:

1.   On his First Cause of Action, for judgment determining that the USPS violated Title VII and is, therefore, liable to Mr. Ford for damages equal to his lost wages, lost employment benefits, and other compensation which was denied or lost to Mr. Ford as a result of the USPS's violations of Title VII;

2.   On his Second Cause of Action, for judgment determining that the USPS violated the ADEA and is, therefore, liable to Mr. Ford for damages equal to his lost wages, lost employment benefits, and

other compensation which was denied or lost to Mr. Ford as a result of the USPS's violations of ADEA, plus an equal amount as liquidated damages;

3.    On his Third Cause of Action, for judgment determining that the USPS violated the Vocational Rehabilitation Act and is, therefore, liable to Mr. Ford for damages equal to his lost wages, lost employment benefits, and other compensation which was denied or lost to Mr. Ford as a result of the USPS's violations of Vocational Rehabilitation Act;

4.    On his Fourth Cause of Action, for judgment determining that the USPS violated the anti-retaliation provisions of the above-cited Acts and is, therefore, liable to Mr. Ford for pecuniary and non-pecuniary damages, for compensatory damages, for emotional distress, and other harm and injuries;

5.    For prejudgment interest on his lost wages;

6.    For Mr. Ford's reasonable attorneys' fees, reasonable expert witness fees, and any other costs of the action;

7.      For post-judgment interest on all amounts awarded to Mr. Ford

herein accruing from the date of judgment to the date of

satisfaction of judgment awarded herein; and

8.      For such other and further legal and equitable relief as this Court

deems appropriate under the circumstances.

DATED this 8th day of March, 2017.


   /s/ David J. Holdsworth

David J. Holdsworth

*Attorney for Plaintiff*

VERIFICATION

Howard O. Ford , being first duly sworn, upon his oath, deposes and says that he is the Plaintiff in the above-entitled action, that he has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of his own knowledge, except as to those matters alleged on information and belief which he believes to be true.


   /s/ Howard O. Ford
Howard O. Ford


SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of March, 2017.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:    RESIDING AT: _____

_____